UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

_____

JULIANA DIGIOSIA, M.D.,


                    Plaintiff,
        v.                                            Case No. 12-CV-01292-WCG

AURORA HEALTH CARE, INC.,

                    Defendant.


_____

**AURORA'S MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

_____


                          Dated:  January 3, 2014.

                          JUDITH A. WILLIAMS-KILLACKEY
                          State Bar No. 1029928
                          MARY PAT JACOBY
                          State Bar No. 1016956
                          Quarles & Brady LLP
                          411 East Wisconsin Avenue, Ste. 2350
                          Milwaukee WI  53202
                          (414) 277-5439

                          *Attorneys for Defendant*
                          *Aurora Health Care, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 3

I.     DR. DIGIOSIA'S EMPLOYMENT WITH AURORA MEDICAL GROUP – OSHKOSH ........................................................................................................... 3

II.    ISSUES IN SUMMER 2008 ................................................................................. 4

    A.    Baby's Death Following June 23 C-Section ............................................. 4

    B.    Concerns Following the Root Cause Analysis .......................................... 7

    C.    A Second Sentinel Event – Stillbirth Death ............................................. 7

III.   PEER REVIEW OF DR. DIGIOSIA'S CASES ................................................. 8

    A.    Dr. Laibly's Report To Dr. Devermann ................................................... 8

    B.    Dr. Laibly's Report To Dr. Duffy ............................................................ 9

    C.    Dr. Laibly's Report To Dr. Kiefer .......................................................... 10

    D.    Temporary Suspension Of Dr. DiGiosia's Practice ............................... 11

    E.    November 6 Management Committee Meeting ....................................... 14

    F.    November 10 Meeting With Dr. DiGiosia ............................................. 15

IV.   PEER REVIEW RESULTS ................................................................................ 16

    A.    Review by Dr. Assell .............................................................................. 16

    B.    Review by Dr. Mason .............................................................................. 17

    C.    Peer Review Committee Meetings and Conclusions .............................. 18

V.    TERMINATION DECISION .............................................................................. 19

VI.   POST-TERMINATION EVENTS ...................................................................... 20

ARGUMENT ..................................................................................................................... 20

I.     THE SUMMARY JUDGMENT STANDARD .................................................. 20

II.    DR. DIGIOSIA'S ADA CLAIMS FAIL ........................................................... 21

    A.    Dr. DiGiosia Cannot Provide Direct Evidence ...................................... 22

    B.    Dr. DiGiosia's Claims Fail Under the Indirect Method .......................... 22

        1.    Dr. DiGiosia's Leave Of Absence Claim Fails ......................... 24

            a.    Dr. DiGiosia Cannot Establish That Aurora Regarded Her as Disabled When It Placed Her On Leave ..................................... 24

            b.    Dr. DiGiosia Was Not Meeting Aurora's Legitimate Employment Expectations .................................................................. 26

i

       c.     Dr. DiGiosia Cannot Identify Any Similarly Situated Individuals Who Were Treated More Favorably ............................................... 26

       d.     Dr. DiGiosia Cannot Establish Pretext ........................................... 26

    2.     Dr. DiGiosia's Discharge Claim Fails As A Matter Of Law .................... 27

       a.     Aurora Did Not Regard Dr. DiGiosia As Disabled ..................... 27

       b.     Dr. DiGiosia Was Not Meeting Aurora's Job Expectations ......... 28

       c.     Dr. DiGiosia Cannot Identify Any Similarly Situated Individuals Who Were Treated More Favorably ............................................... 28

       d.     Dr. DiGiosia Cannot Establish Pretext ........................................... 29

III.    AURORA IS ENITTLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR REPAYMENT OF $19,649, WITH INTEREST AND ATTORNEYS' FEES ............... 30

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Amadio v. Ford Motor Co.,*
238 F.3d 919 (7th Cir. 2001) ................................................................ 25

*Banaszak v. Ten Sixteen Recovery Network*
2013 WL 2623882 (E.D.Mich 6/11/2013) ........................................... 24

*Buie v. Quad/Graphics, Inc.,*
366 F.3d 496, 503 (7th Cir. 2004) ....................................... 21, 22, 23, 24

*Celotex Corp. v. Catrett,*
477 U.S. 317, 322 (1986) ..................................................................... 21

*Cody v. CIGNA Healthcare,*
139 F.3d 595, 599 (8th Cir. 1998) ....................................................... 25

*Dickerson v. Bd. of Trustees of Community College,*
657 F.3d 595, 601 (7th Cir. 2011) ....................................................... 22

*Douglas v. District of Columbia Housing Authority,*
___F.Supp.2d____, 2013 WL 5764842 (D.D.C. 10/25/13) ................... 25

*Frobose v. American Sav. & Loan Ass'n of Danville,*
152 F.3d 602, 617 (7th Cir. 1998) ....................................................... 22

*Heffernan v. Provident Life & Acc. Ins. Co.,*
45 F.Supp.2d 1147, 1154 (D. Kan. 1999) ............................................ 25

*Hoffman v. Caterpillar,*
256 F.3d 568, 572 (7th Cir. 2001) ....................................................... 21

*Johnson v. Norfolk Southern Corp.,*
2003 WL 1582382, *7 (N.D. Ill. 2003) ................................................ 23

*Keith v. Ashland, Inc.,*
205 F.3d 1340, 2000 WL 178389 (6th Cir. 2000) ................................ 25

iii

# TABLE OF AUTHORITIES cont'd.

## CASES

*Kelly v. Drexel Univ.*,
94 F.3d 102, 109 (3rd Cir. 1996) .................................................................... 25

*Kupstas v. City of Greenwood*,
398 F.3d 609, 612 (7th Cir. 2005) ................................................................... 23

*McDonald v. Vill. of Winnetka*,
371 F.3d 992, 1001 (7th Cir. 2004) ................................................................. 21

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ................................................................................. 21, 22

*Pugh v. City of Attica, Indiana*,
259 F.3d 619, 625 (7th Cir. 2001) ............................................................ 23, 24

*Rand v. CV Industries, Inc.*,
42 F.3d 1139, 1146 (7th Cir. 1994) ................................................................. 21

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133, 143 (2000) ................................................................................ 24

*Rogers v. City of Chi.*,
320 F.3d 748, 752 (7th Cir. 2003) ............................................................ 21, 22

*St. Mary's Honor Ctr. V. Hicks*,
509 U.S. 502, 511 (1993) ................................................................................ 24

*Serwatka v. Rockwell Automation*,
591 F.3d 957, 962 (7th Cir. 2010) ................................................................... 24

*Sutton v. United Air Lines, Inc.*,
527 U.S. 471, 498 (1999) .......................................................................... 22, 23

*Valentine v. Standard & Poor's*,
50 F.Supp.2d 262, 285 (S.D.N.Y. 1999) ......................................................... 25

*Wright v. Ill. Dept. of Corrections*,
204 F.3d 727, 732 (7th Cir. 2000) ................................................................... 25

# TABLE OF AUTHORITIES cont'd.

**Page**

## FEDERAL STATUTES

Fed.R.Civ.P. 8(b)(6) ................................................................................................ 30

Fed.R.Civ.P. 56(a) ................................................................................................. 20

42 U.S.C. § 12102(2)(C) ....................................................................................... 23

42 U.S.C. § 12102(3) ............................................................................................. 23

42 U.S.C. § 12112(a) ............................................................................................. 21

QB\22181288.10

# INTRODUCTION

Plaintiff, Dr. Juliana DiGiosia, began working at Defendant, Aurora Health Care's Oshkosh Clinic in 2002 as an OB/GYN.  In 2008, after a baby died following a C-section performed by Dr. DiGiosia and a patient treated by Dr. DiGiosia delivered a stillborn baby, all within a ten-week period, Dr. DiGiosia's colleagues became concerned about her ability to provide safe obstetric care for patients.  As a result, the Clinic instituted an outside peer review of a number of Dr. DiGiosia's cases, including these two cases.  The Clinic required Dr. DiGiosia to take a leave of absence, pending completion of the peer review process, offering Dr. DiGiosia three leave options.  Dr. DiGiosia chose to apply for and was granted a medical leave. As the peer review process continued, Aurora allowed Dr. DiGiosia to return to work, limited to office gynecology for patient safety reasons, until the peer review was completed.

Dr. Tina Mason, who performed the external peer review, idenitfied several areas of concern with Dr. DiGiosia's patient care.  The Clinic's Peer Review Committee shared Dr. Mason's concerns.  Following the completion of the peer review, the Clinic's Management Committee decided to terminate Dr. DiGiosia's employment.

In this suit, Dr. DiGiosia claims that she was: (1) discriminated against in the terms and conditions of her employment under the Americans with Disabilities Act ("ADA") when Aurora required her to take a leave of absence; and (2) discriminated against in violation of the amendments to the ADA ("ADAAA") when Aurora discharged her.  In support of these claims Dr. DiGiosia does not assert that she was actually disabled, but instead that Aurora regarded her as disabled due to an alleged bipolar disorder.  Summary judgment should be granted, dismissing Dr. DiGiosia's claims.

1

As a matter of law, Dr. DiGiosia cannot establish that Aurora regarded her as disabled; that she was meeting Aurora's legitimate expectations at the time Aurora required that she take leave; or that others similarly situated to her were treated more favorably. But even if Dr. DiGiosia could establish a *prima facie* case, she cannot prove that Aurora's reason for requiring the leave – concerns about patient safety – is pretextual. Aurora directed Dr. DiGiosia to take a leave shortly after a second baby died under her care, and after her colleagues raised concerns about Dr. DiGiosia's patient care and behavior.

Dr. DiGiosia also, and as a matter of law, cannot establish that Aurora discharged her because of a disability. Dr. DiGiosia cannot establish that the Aurora decision makers regarded her as disabled – the vast majority of the Management Committee did not even know that Dr. DiGiosia claimed to have any impairment; she cannot establish that she was meeting Aurora's legitimate expectations at the time of her discharge; and, she cannot establish that anyone similarly situated to her was treated better. But even if Dr. DiGiosia could establish a *prima facie* case, she cannot prove that the reasons for her discharge – clinical and behavior issues resulting in a concern for patient safety and a loss of confidence in her abilities – were pretext for discrimination based on a perceived disability. Aurora terminated Dr. DiGiosia's employment only after Dr. Mason completed a peer review and identified serious issues with Dr. DiGiosia's patient care. In sum, there is no evidence suggesting that Aurora's concerns for patient safety, following two sentinel events (the babies' deaths) in less than three months and an outside review noting several concerns about Dr. DiGiosia's handling of cases, were not the real reason for Aurora's discharge decision.

Aurora also is entitled to summary judgment on its counterclaim that Dr. DiGiosia breached her Physician Employment Agreement, or alternatively that she was unjustly enriched,

by keeping an overpayment of $19,649 in draws based on the production formula in the Physician Employment Agreement. Dr. DiGiosia defaulted on the counterclaim, and in no event does she have the right to retain this overpayment.

**FACTUAL BACKGROUND**

## I.    DR. DIGIOSIA'S EMPLOYMENT WITH AURORA MEDICAL GROUP – OSHKOSH

Dr. DiGiosia began working for Aurora Medical Group at Aurora's Oshkosh Clinic in January 2002, as an attending obstetrician/gynecologist in the Clinic and Oshkosh Hospital. In 2008-2009, the Clinic's OB/GYN Department consisted of Dr. DiGiosia and her partners, Drs. Megan Landauer, Robert Holly, Michael Pech, Sheila Anderson and Shawn Laibly, who also was Chair of the Hospital OB/GYN Department. (Stipulated Proposed Findings of Fact ("SPFOF") 1, 4; Tr. [1] 290, 301-302, 564, 565, 645; Hearing Ex. 17; Aurora's Proposed Findings of Fact ("APFOF") 7; Tr. 193-194, 701-702) Dr. DiGiosia also worked one day a week at the AMG clinic in Fond du Lac. (APFOF 3; DiGiosia Dep. 48)

Aurora Medical Group – Oshkosh is governed by a Management Committee that makes decisions regarding physician hiring, performance and termination. (SPFOF 2; Tr. 157, 159, 704-705, 961-962) The Management Committee, by a two-thirds vote, may terminate a physician's employment "without cause". (APFOF 1; Hearing Ex. 17 at 5) In 2008-2009, the Management Committee included ten voting members and four non-voting members. (SPFOF 3; Tr. 158, 163, 167-168, 193, 196, 517-518, 885, 898-899, 964, 1011; Hearing Ex. D) Among the voting members were Drs. Landauer, Robert Duffy and Richard Kiefer (then President of the Management Committee). (*Id.*) The Clinic also has a Peer Review Committee, chaired by Dr.

---

[1] The Wisconsin Equal Rights Division ("WI ERD") held a four-day contested evidentiary hearing on Dr. DiGiosia's claims, after which it dismissed those claims. References to "Tr." are to the transcript of this hearing.

3

Duffy, that deals with clinic-related patient care issues.  (APFOF 2, 30; Tr. 158-159, 174-175, 196)

In March 2005, as part of Dr. DiGiosia's re-application for medical staff membership needed to maintain hospital privileges, Dr. Pech completed a confidential evaluation form for Dr. DiGiosia, evaluating her performance and behavior as "good" in all categories and recommending Dr. DiGiosia for continued hospital staff membership.  (SPFOF 7, 8; Tr. 672-673, 706; Hearing Ex. 14)

Dr. DiGiosia requested leave in July 2007, when her husband was injured in a motor vehicle accident that resulted in the death of another individual.  (SPFOF 16; Tr. 666-667, 672; Hearing Ex. II)  In August 2008, the Oshkosh newspapers publicized that Dr. DiGiosia's husband was charged with manslaughter arising out of his role in the July 2007 accident. (SPFOF 18; Tr. 668, 671-672)  Dr. DiGiosia spoke openly with the other OB/GYN Department physicians about her personal problems with her husband.  (SPFOF 17; Tr. 299-301, 670-71)

In August 2007, Dr. Holly, a member of the Hospital Credentials Committee, recommended for approval Dr. DiGiosia's application for re-appointment to medical staff membership at Aurora Medical Center – Oshkosh.  (SPFOF 11; Tr. 676; Hearing Ex. KK)

## II.    ISSUES IN SUMMER 2008

### A.    <u>Baby's Death Following June 23 C-Section</u>

On June 23, 2008, Dr. DiGiosia performed what she describes as a very complex C-section, on a patient for whom she had previously performed a C-section.  (SPFOF 19; Tr. 329) When the delivery took longer than usual and Dr. DiGiosia's arms became tired, Dr. DiGiosia called Dr. Pech to assist with the C-section.  (SPFOF 20; Tr. 330, 668, 677-678, 710; Complaint ¶ 23, Dkt. Entry 1)  Dr. Pech was able to deliver the baby in less than a minute.  (*Id.*)  Following

4

resuscitation efforts by the baby's pediatrician, the baby then was transported to Theda Clark, where the baby died (a "sentinel event"). (SPFOF 21; APFOF 4; Tr. 328, 330-332, 340, 678-679, 680, 816) According to Dr. DiGiosia, the cause of death was disseminated intravascular coagulation ("DIC"), which may be caused by something a doctor does during delivery. (APFOF 5; Tr. 328, 332, 715-716)

At a baby's birth, a blood gas test is performed to check the pH balance of the baby's blood – a pH of less than 7 indicates significant problems. (SPFOF 22; Tr. 344) The first blood gas test performed at the June 23 delivery measured the baby's pH at 7.1, but there were questions about the accuracy of this initial blood gas measurement, as subsequent tests measured the blood gas as 6.7. (SPFOF 24; APFOF 6, 30; Tr. 344-345, 680-681, 714; Hearing Ex. 46 at AUR-JD 000283) If properly performed, the pediatrician's resuscitation efforts should have increased the blood gas measurement. (SPFOF 23; Tr. 684-685)

On July 7, 2008, the Hospital conducted a Root Cause Analysis ("RCA") of the baby's death. (SPFOF 25; Tr., 349; Hearing Ex. 24) A RCA brings together the doctors, nurses and pharmacist involved in the care at issue, a risk management expert, a Hospital administrator and an investigator, to review everything that happened – and did not happen – and determine what could have been done differently to improve practices and prevent the recurrence of the outcome under review. (SPFOF 26; Tr., 340-341, 711-712)

The July 7 RCA participants, including Drs. Laibly, Pech and DiGiosia, discussed all that happened at the June 23 C-section. (SPFOF 27; Tr. 342, 349, 686, 712-713; Hearing Ex. 24) Dr. DiGiosia explained that she encountered some difficulty with the placenta and the appropriate angle to deliver the baby, and she then called Dr. Pech when her arm became weakened and she felt that she could not deliver the baby. (SPFOF 28; Tr. 712-713) Dr. Laibly

was concerned about Dr. DiGiosia's explanation of her performance during the June 23 delivery because he understood that, while Dr. DiGiosia said she had significant difficulty delivering the baby, Dr. Pech was able to deliver the baby in less than a minute. (APFOF 7; Tr. 707, 710, 711, 713) Dr. Laibly also did not understand Dr. DiGiosia's explanation as to why she could not get the baby's head out of the mother's pelvis. (APFOF 8; Tr. 707, 710, 711, 713) Moreover, Dr. Laibly had concerns about the length of time that it took to deliver the baby because it appeared that Dr. DiGiosia struggled for several minutes before calling for assistance and, in fact, the medical records showed that it actually took 20 minutes from incision to time of delivery. (APFOF 9; Tr. 711; Hearing Ex. 46)

The RCA also identified the initial blood gas measurement as a concern – that the measurement was wrong because the nurse who had performed it had used a machine with which she was unfamiliar and a collection technique that was questionable. (SPFOF 29; Tr. 688-689, 713-714; Hearing Ex. LL at AUR-JD 000667, Hearing Ex. 46 at AUR-JD 000284) Subsequent tests measured the blood gas as 6.7 (SPFOF 30; Tr. 714; Hearing Ex. 46 at AUR-JD 000283), suggesting that the initial blood gas measurement was incorrect because it should not have gone down after the baby had been resuscitated. (SPFOF 30; Tr. 1136-1137; Hearing Ex. 57)

A second RCA was performed on July 29, 2008 so that Dr. Suneet Chauhan, a fetal medicine specialist who had not attended the first RCA, could attend and provide a review of the June 23 C-section. (SPFOF 31; Tr. 350, 352-353, 686, 716, 1022, 1023; Hearing Exs. 24, 25) Dr. Laibly also attended this RCA and he was very concerned with Dr. Chauhan's review – it did not appear that Dr. Chauhan gave any consideration to the second blood gas test or how it could have been lower if the first blood gas test had been correctly measured. (APFOF 10; Tr. 350-351, 716-717; Hearing Ex. 25) Dr. Devermann also was concerned with Dr. Chauhan's

6

conclusion following the RCA that "everything was done properly", even though a baby had died. (APFOF 11; Tr. 1033, 1044-1045, 1143)

B. **Concerns Following the Root Cause Analysis**

After the June 23 sentinel event, Dr. Laibly's concerns about Dr. DiGiosia continued to grow. In conversations with Dr. DiGiosia regarding the baby's death, Dr. Laibly perceived Dr. DiGiosia's response to the event as seriously lacking—she did not appear to have the appropriate concern about the baby''s death. (APFOF 12; Tr. 707-708) At the same time, Dr. Laibly believed that Dr. DiGiosia was experiencing significant challenges in her personal life based on her discussions with him. (APFOF 13; Tr. 301, 670-671, 707-709)

As the summer progressed, staff members told Dr. Laibly that Dr. DiGiosia did not seem herself, and these observations were consistent with those of Dr. Laibly. (APFOF 14; Tr. 717-718, 738-739) On one occasion that summer, Dr. Laibly became frustrated with Dr. DiGiosia because he believed that Dr. DiGiosia, while working at the Fond du Lac Clinic, was handing off to him a complicated patient that she did not want to handle. (APFOF 15; Tr. 718-719, 734-735) Drs. Landauer and Pech also told Dr. Laibly that they had similar frustrations with Dr. DiGiosia using her days at the Fond du Lac Clinic as a way to get out of work early. (APFOF 16; Tr. 741) On those days when Dr. Pech and Dr. DiGiosia both worked at the Fond du Lac Clinic, Dr. DiGiosia would leave the Clinic at 2:00 p.m. and not return to work. (APFOF 17; DiGiosia Dep. 48, 56-57)

C. **A Second Sentinel Event – Stillbirth Death**

On August 4, 2008, Dr. DiGiosia saw a diabetic patient on a Monday, three days before the patient's scheduled C-section. (SPFOF 32; Tr. 360-361, 365-366, 1140-1141; Hearing Ex. I) According to Dr. DiGiosia, when she saw the patient on Monday she ordered a nonstress test ("NST") to assess the baby's health because the patient reported decreased fetal movement the

day before.  (SPFOF 33; Tr. 362, 366-369)  Dr. DiGiosia read the patient's Clinic NST strip to

be non-reactive (i.e. not showing sufficient fetal movement), so she sent the patient to the

Hospital labor and delivery unit to have another NST performed.  (SPFOF 34; Tr. 367)  Dr.

DiGiosia read the Hospital NST strip as being reactive (showing sufficient fetal movement) and

she sent the patient home.  (SPFOF 35; Tr. 691, 693)  Thirty-six hours later, the patient returned

to the Hospital and her baby was delivered stillborn.  (SPFOF 36; Tr. 362, 365-366, 719)

Dr. Laibly spoke with Dr. DiGiosia about the stillbirth because he believed that the

Hospital NST strip Dr. DiGiosia had read as reactive, in fact, was nonreactive.  (*Id*.)  Dr.

DiGiosia, however, again asserted that the strip was reactive, and she appeared to Dr. Laibly to

be more concerned about no longer treating high-risk diabetic patients (the "tough patients"),

than she was about the stillborn baby.  (APFOF 19, 20; Tr. 719-721, 724-725)  Based on this

conversation, Dr. Laibly believed that Dr. DiGiosia was unwilling to treat these patients, causing

him to lose trust and confidence in Dr. DiGiosia as his partner.  (APFOF 21; Tr. 725, 814)

## III.     PEER REVIEW OF DR. DIGIOSIA'S CASES

After these deaths, Dr. DiGiosia's partners no longer trusted Dr. DiGiosia to treat their

patients.  (APFOF 22; Tr. 730-731)  As a result, and based on his concern for patient safety, Dr.

Laibly spoke with Drs. Devermann, Duffy, and Kiefer regarding Dr. DiGiosia's handling of

patients and the babies' deaths.  (APFOF 23; Tr. 174-175, 722)

### A.      Dr. Laibly's Report To Dr. Devermann

Dr. Laibly had previously spoken with Dr. Devermann regarding his concerns about the

RCA conducted on the first baby's death, and he again spoke with Dr. Devermann on August 19,

2008, after the second baby's death.  (APFOF 24; Tr. 722-723, 724, 1060, 1144, Hearing Ex. 51)

At that time, Dr. Laibly suggested a peer review of Dr. DiGiosia's cases.  (*Id*.)  Dr. Laibly told

Dr. Devermann that he believed Dr. DiGiosia had misread the NST strips for several patients, including the mother of the stillborn baby, even though reading NST strips was a basic task Dr. DiGiosia should have been able to perform. (APFOF 25; Tr. 1144-1145; DiGiosia Dep. 51) Dr. Laibly also pointed out to Dr. Devermann that the pH results for the first baby who died did not make sense—he was concerned that the initial pH test, upon which Dr. Chauhan based his RCA finding, was incorrect. (APFOF 29; Tr. 1089, 1148) As Vice President of Medical Operations for Oshkosh, Fond du Lac, Sheboygan and their respective counties, Dr. Devermann also was concerned about a trend—two baby deaths within such a short period of time, in the same Hospital and involving the same physician—and the questions it might raise about the quality of obstetric care at the Hospital. (APFOF 26; Tr. 1011-1012, 1145) Dr. Devermann shared Dr. Laibly's response to these "two pretty disastrous events close together" and so consulted with his leadership, who agreed that a peer review was warranted. (APFOF 27; Hearing Ex. 51)

In addition, in September 2008, Dr. Devermann saw for the first time Theda Clark's records of the June 23 baby death. (APFOF 28; Tr. 1058; Hearing Ex. MM) Based on these records, Dr. Devermann believed that the death of the first baby was due to severe perinatal asphyxia, metabolic acidosis and anemia related to the birth process. (*Id.*) If that were the case, it indicated, contrary to the RCA findings, that the first baby's death was caused by something that happened during the C-section. (APFOF 28; Tr. 728-729, 1058; DiGiosia Dep. 53-54)

### B. Dr. Laibly's Report To Dr. Duffy

Dr. Laibly also informed Dr. Duffy about the two infant deaths and his concerns about Dr. DiGiosia's test interpretations and her care of a particular outpatient. (APFOF 30; Tr. 162, 164, 740; Hearing Ex. C) Dr. Laibly thought an outside expert should review a few of Dr. DiGiosia's cases and provide an objective, unbiased assessment about Dr. DiGiosia's handling of

9

them. (APFOF 31; Tr. 742-743, 833-834) After speaking with Dr. Laibly, Dr. Duffy obtained

approval from Dr. Devermann to have an outside reviewer look into the cases to see if there were

an issue with Dr. DiGiosia's quality of care. (APFOF 32; Tr. 162-163, 172; Hearing Ex. C)

Dr. Laibly did not know at the time that he spoke with either Dr. Devermann or Dr. Duffy

that Dr. DiGiosia had a medical condition, and he first learned of this when Dr. Devermann told

him, on October 3, 2008, that Dr. DiGiosia needed to obtain medical clearance before returning

to work. (APFOF 33; Tr. 740-741; Hearing Ex. 55) Dr. Duffy also did not know at this, or at

any time, that Dr. DiGiosia allegedly had bipolar disorder. (APFOF 34; Tr. 161) Like Dr.

Laibly, however, Dr. Duffy was aware that Dr. DiGiosia was dealing with what he believed were

serious personal issues involving her husband. (APFOF 35; Tr. 161)

### C.    Dr. Laibly's Report To Dr. Kiefer

Dr. Laibly also spoke with Dr. Kiefer, President of the Clinic's Management Committee,

on September 11, 2008. (APFOF 36; Tr. 729-730, 926; Hearing Ex. 40 at AUR-JD 000955-

000957) He told Dr. Kiefer of Dr. DiGiosia's difficulties with the delivery of the first baby who

died (APFOF 36; Tr. 729-730, 926; Hearing Ex. 40 at AUR-JD 000955-000957), his concerns

with Dr. DiGiosia's incorrect reading of NST strips and his concerns regarding Dr. DiGiosia's

physical appearance while at work. (APFOF 37; Tr. 965-968, 970; Hearing Ex. 40)

On September 17, 2008, Dr. Laibly again spoke with Dr. Kiefer and told him of an event

two days earlier where a patient, who had been evaluated by Dr. DiGiosia, returned the next day

and was admitted by Dr. Laibly for further testing and evaluation. (APFOF 38; Tr. 908-909,

929, 971; Hearing Ex. 40 at AUR-JD 000962-963) Dr. Laibly also repeated to Dr. Kiefer the

comments of one of Dr. DiGiosia's nurses that Dr. DiGiosia had an "attitude" at times that she

did not want to be there, and that the nurse was concerned, based on Dr. DiGiosia's quality of

care, that there might be another baby death.  (APFOF 39; Tr. 908-909, 971-972; Hearing Ex. 40)  Dr. Laibly also mentioned in this conversation with Dr. Kiefer concerns regarding Dr. DiGiosia leaving work early when assigned to the Fond du Lac Clinic and that Dr. DiGiosia's partners had to handle Dr. DiGiosia's patients because of her unavailability.  (APFOF 40; Tr. 930-31, 972-973; Hearing Ex. 40)

After speaking with Dr. Laibly, Dr. Kiefer spoke with Dr. Pech, who shared Dr. Laibly's belief that Dr. DiGiosia was not spending enough time with her patients and that she was not fully evaluating or seeing through to resolution problems she identified.  (APFOF 41; Tr. 910, 931, 973; Hearing Ex. 40 at AUR-JD 000963-964)  Dr. Pech also expressed concern that Dr. DiGiosia was relying on other members of the OB/GYN Department to perform her work and that Dr. DiGiosia was not correctly reading NST strips.  (APFOF 42; Tr. 910-911, 974-977; Hearing Ex. 40)

Based on what he learned, Dr. Kiefer was concerned that Dr. DiGiosia's pattern of patient care demonstrated unsafe practices and that there were issues regarding Dr. DiGiosia's behavior and personal appearance in the Clinic.  (APFOF 43; Tr. 912-913)

### D.    Temporary Suspension Of Dr. DiGiosia's Practice

In September 2008, Dr. Kiefer spoke with Dr. Devermann and Diane Ekstrand, Aurora's Vice President of Human Resource Services responsible for dealing with physician performance issues and providing human resources support to the Oshkosh Clinic, regarding his concerns about the safety of Dr. DiGiosia's practice based on her colleagues' reports.  (APFOF 44; Tr. 398, 407-411, 928, Hearing Ex. 40)  At that time, it was decided that Dr. Kiefer would urge Dr. DiGiosia to take a leave of absence due to the increasing concerns related to her behavior at work, her clinical performance and the serious concern about quality of care and patient safety,

with the type of leave to depend upon Dr. Kiefer's conversation with Dr. DiGiosia and whether she may be eligible for medical leave. (APFOF 45; Tr. 432, 980-981) Aurora has placed other physicians on leave while a peer review was ongoing, and Dr. Kiefer was prepared to place Dr. DiGiosia on administrative leave, if necessary. (APFOF 46; Tr. 916, 1152)

Dr. Kiefer met with Dr. DiGiosia on September 18, 2008. (APFOF 47; Tr. 306-308, 693, 903-904; DiGiosia Dep. 58-59) Dr. Kiefer told Dr. DiGiosia that others were concerned about her clinical and personal behavior and well-being in connection with all the things going on in her personal life at that time. (*Id*.) Dr. Kiefer offered Dr. DiGiosia words of support, told her that Aurora wanted her to be the best provider she could be, and that he was concerned about the life events she was dealing with and whether they were impacting the safety of her practice. (*Id*.) According to Dr. DiGiosia, the first thing Dr. Kiefer did was to ask her about her bipolar condition. (SPFOF 37; Tr. 304-305, 305-306, 309-310, Hearing Ex. 40 at AUR-JD 000965)

During this meeting, Dr. Kiefer told Dr. DiGiosia that she had three options: (1) personal leave without pay; (2) medical leave with short-term disability; and (3) forced leave. (SPFOF 38; Tr. 308, 904, 980) After meeting the next day with Employee Health Nurse Ann Marie Ross and Clinic Supervisor Renee Raether, Dr. DiGiosia contacted the Leave Management Office to request medical leave. (SPFOF 39, 40; Tr. 313, 314, 402, 694, 695-696, 847, 979-980; Hearing Ex. 38) Dr. DiGiosia understood that she needed to provide appropriate medical documentation before her medical leave request would be approved, and she asked Dr. Vicente, her treating physician, to complete the required medical information, which he did. (SPFOF 13, 41; Tr. 14, 313, 696-697, 850-881; Hearing Ex. 1, Hearing Ex. 2)

Aurora gave Dr. DiGiosia a September 30, 2008 letter informing her that before returning to work: (1) Dr. DiGiosia needed to contact the Employee Assistance Program ("EAP") so that

the EAP could confirm Dr. DiGiosia's compliance with her doctor's recommendations; (2) Dr. DiGiosia needed a release to return to work from her physician; and (3) the peer review processes had to be completed. (SPFOF 42; Tr. 416-417, 417-419, 503-505, 984-985; Hearing Exs. 22, O) This letter further informed Dr. DiGiosia that after these steps had been met, the Management Committee would consider all the information and records and make a recommendation regarding Dr. DiGiosia's continued employment status with Aurora. (APFOF 48; Tr. 419) Ms. Ekstrand drafted the September 30 letter for Dr. Kiefer's signature. No one had mentioned Dr. Digiosia's medical condition to Ms. Ekstrand, and she was unaware of it at this time. (APFOF 49; Tr. 416-417, 420, Ex. O)

The Management Committee discussed Dr. DiGiosia's situation at its October 2 meeting and noted that the OB/GYN Department supported Dr. DiGiosia's temporary suspension, and her return to work being conditioned upon a positive recommendation from the Peer Review Committee. (APFOF 50; Tr. 1156-1157; Hearing Ex. 7) Following the October 2 Management Committee meeting, Dr. Devermann began looking for a way to bring Dr. DiGiosia back to work while the peer review was on-going, because he knew the peer review process could take a long time. (APFOF 51; Tr. 1068-1069)

On October 20, 2008, after Dr. DiGiosia told him she was ready to return to work, Dr. Vicente completed a return to work form for Dr. DiGiosia, stating she could return to work. (SPFOF 43; Tr. 24, 867-868; Hearing Ex. 3) However, Dr. DiGiosia was not immediately returned to work at this time. (SPFOF 44; Tr. 578-579)

On November 4, Drs. Devermann, Kiefer, and Laibly and Ms. Ekstrand discussed Dr. DiGiosia's leave status, including concerns raised by Dr. DiGiosia's partners and concerns for patient safety. (APFOF 52; Tr. 442-443, 443-444, 1171-1172, 1175; Hearing Exs. U, DD) At

this point, the OB/GYN Department physicians had voted against Dr. DiGiosia's return as their partner, if the Management Committee would support this action. (APFOF 54; Tr. 1175; Hearing Ex. U) In addition, during the November 4 discussison, Dr. Devermann informed Drs. Kiefer, and Laibly and Ms. Ekstrand of issues with completing the peer review and they discussed returning Dr. DiGiosia to work in a limited capacity, while the peer review was being completed. (APFOF 53; Tr. 443-444, 988-989, 1174)

E.     **November 6 Management Committee Meeting**

At the November 6 Management Committee meeting, Drs. Landauer, Anderson, and Pech and Ms. Raether briefed the Management Committee on Dr. DiGiosia's quality and performance issues and concerns regarding patient safety, including the infant deaths, test interpretations and management of high risk patients. (APFOF 55; Tr. 168-169, Hearing Ex. D) At this meeting, the Management Committee also learned that all of the nurse midwives, who rely on the on-call physician for backup in difficult deliveries, felt uncomfortable taking call with Dr. DiGiosia and that four of the five OB/GYN Department physicians had voted against Dr. DiGiosia's return to the practice. (APFOF 56; Tr. 170-171, 207-208) No one discussed Dr. DiGiosia's alleged bipolar condition at this meeting. (APFOF 57; Tr. 169)

After the Management Committee discussed whether Dr. DiGiosia should remain on leave pending completion of the peer review, Dr. Landauer moved to bring Dr. DiGiosia's administrative leave to an end as soon as possible and to return her to work in a limited capacity. (APFOF 58; Tr. 170, 445, 990-991; Hearing Ex. D) Aurora previously had limited a physician's practice based on clinical concerns. (APFOF 59; Tr. 445, 521-522)

The OB/GYN Department members met after the Management Committee meeting and decided they did not want Dr. DiGiosia to be part of their team because they had lost trust and

14

confidence in her. (APFOF 60; Tr. 743, 748, 991-992, 1107-1108) Dr. Landauer subsequently provided Dr. Devermann with a written statement of the OB/GYN Department, supported by a four-to-one vote, that the Department no longer wanted to share obstetrical responsibilities and call with Dr. DiGiosia because of issues related to trust and the quality of care she provided. (APFOF 61; Tr. 1108; Hearing Ex. 59) The Department also did not believe that limiting Dr. DiGiosia's practice to gynecological services was a long-term solution. (*Id.*)

### F. November 10 Meeting With Dr. DiGiosia

On November 10, Clinic Administrator David Zerbe and Dr. Devermann met with Dr. DiGiosia and told her that the on-going peer review could take awhile longer to complete, so she could return to performing office gynecology, but that she could not do surgeries or deliveries. (SPFOF 46, 47; Tr. 384, 1160-1161; Hearing Ex. 27) Dr. Devermann also shared with Dr. DiGiosia that the OB/GYN Department had concerns regarding her teamwork, accountability and work ethic, and he offered as an example the concern that Dr. DiGiosia left the Fond du Lac Clinic in the afternoon before the end of the work day and did not return to the Oshkosh Clinic to follow-up with patients. (SPFOF 48; Tr. 871, 1162, 1178; Hearing Exs. 27, 41)

Dr. Devermann also told Dr. DiGiosia that her partners had concerns about her taking off early and not coming back to work, about her unavailability and dumping her patients on her partners, and that her partners complained of poor patient handoffs. (SPFOF 49; Tr. 871-872; Hearing Ex. 27) Dr. Devermann told Dr. DiGiosia that in light of these quality and behavioral issues, the OB/GYN Department had lost trust and confidence in Dr. DiGiosia's ability to work and provide quality, safe care for their patients and that Dr. DiGiosia needed to take immediate action to correct this behavior. (SPFOF 50; Tr. 872; Hearing Ex. 27)

When Dr. DiGiosia asked Dr. Devermann if this request to take corrective action was related to her history of mental health disorders, Dr. Devermann explained to Dr. DiGiosia that when a physician is performing at a sub-par level, Aurora needs to insure that the physician is fit for work and to confirm that performance issues are not related to an impairment, so that Aurora can hold the physician accountable for the performance issues. (APFOF 62; Tr. 875, 1164; Hearing Ex. 27) After Aurora received Dr. DiGiosia's release to return to work, Dr. Devermann had no concerns about her mental health status and none of her colleagues expressed any concerns about her mental health. (APFOF 63; Tr. 1164-1165) Dr. DiGiosia returned to work on about November 18, 2008. (APFOF 64; Tr. 385)

On December 5, 2008, Dr. Devermann gave Dr. DiGiosia a memo summarizing their November 10 meeting and told her that it was possible the peer review would result in the termination of her employment. (APFOF 65; Hearing Exs. X, Y)

## IV. PEER REVIEW RESULTS

### A. <u>Review by Dr. Assell</u>

After the second baby death, Dr. Devermann and his superiors agreed that Dr. Barbara Assell should conduct a peer review, particularly regarding Dr. DiGiosia's interpretation of NST strips, due to concerns that Dr. DiGiosia had read such a test as reactive, when it was not, in managing the patient whose baby was delivered stillborn. (APFOF 66; Tr. 212, 1039-1041) Dr. Assell subsequently told Drs. Laibly and Devermann that she agreed that the NST strip Dr. DiGiosia had read as reactive was *not* reactive, but Dr. Assell failed to prepare a written report. (APFOF 67; Tr. 210-211, 751, 1076)

### B.    Review by Dr. Mason

Dr. Devermann next asked Dr. Tina Mason to perform a more comprehensive review of cases handled by Dr. DiGiosia.  (APFOF 68; Tr. 1076-1077, 1098-1099)  Dr. Mason did so and prepared a report on November 19, 2008.  (APFOF 69; Tr. 177; Hearing Ex. G)

After receiving Dr. Mason's report, Dr. Duffy, as Chair of the Clinic Peer Review Committee, asked Drs. Laibly and Anderson to assist with a Clinic peer review.  (APFOF 70; Tr. 750)  The Peer Review Committee met, reviewed Dr. Mason's November 19 report, agreed that there were performance concerns, and recommended that a sub-committee review the report with Dr. Mason.  (APFOF 71; Tr. 176; Hearing Exs. E, F)  Dr. Laibly, in particular, believed that Dr. Mason's report identified significant concerns with Dr. DiGiosia's interpretation of NST strips, her delivery of the C-section baby, and her management of hypertensive patients.  (APFOF 72; Tr. 753-754; Hearing Ex. G)

Drs. Laibly and Duffy and Ms. Raether subsequently followed up with Dr. Mason, who then prepared a follow-up report dated December 9, 2008, confirming that Dr. DiGiosia incorrectly read the August 4 NST and that there was no documentation that additional antenatal testing was performed on August 4.  (APFOF 73, 74; Tr. 178-179, 216, 754, 833; Hearing Exs. F, G, H)  Dr. Mason also noted concerns about the June 23 C-section performed by Dr. DiGiosia and that ended in the death of the first baby.  (APFOF 74; Hearing Ex. H)  Finally, Dr. Mason confirmed that Dr. DiGiosia had misread the NST strip for one of Dr. Landauer's patients. (APFOF 74; Tr. 880-881, Hearing Ex. H)  Dr. Laibly understood, based on Dr. Mason's report, that Dr. Mason had serious concerns about the care provided by Dr. DiGiosia, and he believed Dr. Mason's reports verified the OB/GYN Department's concerns.  (APFOF 75; Tr. 754, 881)

QB\22181288.10

Dr. DiGiosia had received a copy of Dr. Mason's November 19 report and had spoken with Dr. Mason for about an hour regarding each specific case. (SAPFOF 51; Tr. 386, 580-81) Dr. DiGiosia also prepared a written response, describing her view of each of the cases in detail. (SPFOF 52; Tr. 583; Hearing Ex. I) Dr. DiGiosia subsequently received Dr. Mason's second report, summarizing five of the cases. (SPFOF 53; Tr. 587; Hearing Ex. H)

### C. Peer Review Committee Meetings and Conclusions

The Clinic Peer Review Committee believed that Dr. Mason's report paralleled its own concerns about Dr. DiGiosia's quality of care. (APFOF 76; Tr. 180-181, 756) On December 22, Dr. DiGiosia attended a meeting with a sub-committee of the Clinic Peer Review Committee to explain the cases and answer questions. (SPFOF 54; Tr. 181-182, 585, 587; Hearing Ex. I) At this meeting, Dr. Laibly once again showed the August 4 NST strip to Dr. DiGiosia, and she once again said it was reactive. (SPFOF 55; Tr. 181-182, 585, 587, 757-758; DiGiosia Dep. 67; Hearing Ex. I)

The Committee was not swayed by Dr. DiGiosia's defense and, in particular, did not believe that Dr. DiGiosia adequately explained the cases or took ownership for any potential problems, it believed that she was dismissive of the issues raised by the sub-committee, and it thought she refused to acknowledge that she had misinterpreted the tests. (APFOF 77; Tr. 182-183) The Committee categorized Dr. DiGiosia's performance issues as lack of prenatal care documentation, failure to use specialty services, non-standard management of certain conditions, and interpretations, which did not meet standards, of test results. (APFOF 78; Tr. 183; Hearing Ex. F) The Committee concluded that there were sufficient concerns to present the issue to the Management Committee for further action. (*Id.*)

18

QB\22181288.10

## V.     TERMINATION DECISION

On December 24, 2008, after Ms. Ekstrand learned that the Clinic peer review had been completed, that its conclusions were to be submitted to the Management Committee, and that Dr. DiGiosia's colleagues were concerned by her lack of teamwork and accountability and had recommended termination of her employment, Ms. Ekstrand spoke with Dr. Devermann about the clinical outcomes, Dr. Devermann's level of concern from the peer review, and the Department's loss of confidence.  (APFOF 79; Tr. 460, 461, 1119; Hearing Ex. Z)  She advised Dr. Devermann that the next step most likely would be termination of Dr. DiGiosia's employment.  (*Id*.)

Dr. Devermann met with Dr. DiGiosia on December 29 and informed her that her partners had lost trust and confidence in her, and that her employment likely would be terminated, after a vote of the Management Committee.  (SPFOF 56; Tr. 882-883, 1119-1120; Hearing Exs. 62, 82)

The Management Committee met on January 8, 2009.  (APFOF 80; Tr. 184-185, 186, 955; Hearing Ex. K)  Dr. Duffy summarized for the Management Committee the Clinic Peer Review Committee's meeting with Dr. Mason, Dr. Mason's report, and the Clinic Peer Review Committee's meeting with Dr. DiGiosia and informed the Management Committee that the Clinic Peer Review Committee found significant quality issues with Dr. DiGiosia's patient care. (*Id*.)  The Management Committee also discussed the recommendation of the OB/GYN Department physicians and midwives, who expressed their loss of confidence in Dr. DiGiosia. (APFOF 81; Tr. 1182)  Dr. Devermann and Dr. Kiefer then reported on the various processes and communications that had taken place, and the Management Committee discussed the options regarding Dr. DiGiosia's employment.  (APFOF 82; Tr. 186, 1182-1183)

QB\22181288.10

At this meeting, the Management Committee unanimously decided to terminate without cause Dr. DiGiosia's employment. (SPFOF 57; Tr. 187, 957) Dr. Kiefer and Mr. Zerbe informed Dr. DiGiosia of this decision. (SPFOF 58; Tr. 994-995; Hearing Ex. AA)

## VI. POST-TERMINATION EVENTS

Dr. DiGiosia's Physician Employment Agreement entitled her to compensation based upon a production formula set forth in the Agreement. (APFOF 83, 84; Counterclaim ¶ 6) After Dr. DiGiosia's employment ended, Aurora provided Dr. DiGiosia a reconciliation of her draws against her production earnings, showing that DiGiosia had been paid in advance for work she did not perform and in excess of that to which she was entitled under the production formula, in the amount of $19,649.00. (APFOF 85; Tr. 466-467, 600-602; Hearing Exs. 29, CC; Counterclaim ¶ 7) Pursuant to the Agreement, if Aurora must employ legal counsel to enforce the obligations imposed on Dr. DiGiosia under the Agreement, it is entitled to costs, including but not limited to attorney's fees. (APFOF 87; Counterclaim ¶ 13)

Dr. DiGiosia does not dispute that she is not entitled to the $19,649 based on her actual production, but she has not repaid any of it to Aurora, because she believes the overpayment was the result of Aurora not allowing her to work. (APFOF 85, 86; Tr. 604; DiGiosia Dep. 68-69, 73-74, 74-75; DiGiosia Dep. Ex. 1002; Counterclaim ¶ 8)

<u>**ARGUMENT**</u>

## I. THE SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish

QB\22181288.10

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)  Summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.  *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003)  The non-moving party is entitled to only *reasonable* inferences, not every *conceivable* inference.  *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994)  Indeed, "inferences that are supported only by conjecture or speculation will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)

For the reasons stated below, Aurora is entitled to summary judgment dismissing Dr. DiGiosia's claims that Aurora intentionally discriminated against her because of a disability. Aurora is also entitled to summary judgment on its claim against Dr. DiGiosia for repayment of $19,649.00.

## II.  DR. DIGIOSIA'S ADA CLAIMS FAIL

Title I of the ADA, 42 U.S.C. § 12112(a), prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees."  A plaintiff can show an employer violated the disparate treatment provisions of the ADA by direct evidence or under the indirect burden-shifting approach laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Hoffman v. Caterpillar*, 256 F.3d 568, 572 (7th Cir. 2001); *Buie v. Quad/Graphics, Inc*., 366 F.3d 496, 503 (7th Cir. 2004).  Dr. DiGiosia's discrimination claims fails under both approaches.

QB\22181288.10

## A.  Dr. DiGiosia Cannot Provide Direct Evidence

Direct evidence is evidence that establishes that a prohibited consideration was a motivating factor in an adverse employment action.  *Frobose v. American Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 617 (7th Cir. 1998).  Direct evidence is rare and "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus."  *Buie*, 366 F.3d at 503; *citing Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).  There are no admissions by the Aurora decision makers here that they based either the leave requirement or the discharge decision on any perceived disability, and Dr. DiGiosia has no evidence of such animus.  Dr. DiGiosia, therefore, can defeat summary judgment only under the indirect method, and she does not have the evidence to carry that burden.

## B.  Dr. DiGiosia's Claims Fail Under the Indirect Method

Under the indirect *McDonnell Douglas* burden-shifting method, Dr. DiGiosia must establish a *prima facie* case of discrimination by showing: (1) she was disabled within the meaning of the ADA; (2) she was meeting Aurora's legitimate employment expectations; (3) she suffered an adverse employment decision; and (4) similarly situated employees without a disability were treated more favorably.  *Dickerson v. Bd. Of Trustees of Community College*, 657 F.3d 595, 601 (7th Cir. 2011).

Dr. DiGiosia asserts she is "disabled" because Aurora regarded her as having an impairment. [2]  The "regarded as" portion of the ADA was not intended to limit an employer's right to determine if an employee is fit for duty, particularly when the employee's treating physician acknowledges an impairment.  *Sutton*, 527 U.S. at 490-491 (finding that an employer is free to decide that some limiting, but not substantially limiting impairment makes an

---

[2] Dr. DiGiosia's counsel, in response to Requests to Admit and by email dated September 19, 2013, confirmed that Dr. DiGiosia is pursuing only a claim that she was regarded as disabled, and only with respect to her leave of absence and discharge.  (Williams Decl. Ex. E)

QB\22181288.10

individual unsuited for a job); *Johnson v. Norfolk Southern Corp.*, 2003 WL 1582382, *7 (N.D. Ill. 2003), Williams Decl. Ex. F.

For actions and conduct occurring before the 2009 amendments to the ADA to fall within the statutory definition of being "regarded as disabled", a person must show that: (1) the employer mistakenly believes that a person has a physical or mental impairment that *substantially limits* one or more major life activities, or (2) an employer mistakenly believes that an actual, non-limiting impairment *substantially limits* one or more major life activities. *Sutton*, 527 U.S. at 489 (emphasis added); 42 U.S.C. § 12102(2)(C).

If the impairment that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is substantially limiting, then there is no violation of the ADA under the "regarded as" prong of the statute. *Sutton*, 527 U.S. at 489. The term "substantially limits," like the other terms within the ADA, is interpreted strictly to create a "demanding standard for qualifying as disabled." *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005).

For conduct occurring after January 1, 2009, an individual is "regarded as" disabled under the ADAAA if she establishes that she has been subjected to an adverse employment action because of an actual or perceived physical or mental impairment. 42 U.S.C. § 12102(3).

If the plaintiff establishes a *prima facie* case of disability discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Buie*, 366 F.3d at 503. If the defendant satisfies that minimal showing, the burden then shifts back to the plaintiff, who must then prove that the defendant's explanation is simply pretext for discrimination. *Pugh*, 259 F.3d at 626. Specifically, the plaintiff must prove, with respect to each proffered reason for each disputed employment action, that the defendant has lied and that

each of its proffered reasons are phony or unworthy of credence. *Id.* (*citing*, *Reeves v. Sanderson Plumbing Prods., Inc*. 530 U.S. 133, 143 (2000)); *Buie*, 366 F.3d at 507.

To prove that a defendant's reasons are pretextual requires more than showing that the employer made a mistake or a bad business decision. *Pugh*, 259 F.3d at 626-627. The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. *Id.* Rather, it addresses whether the employer "acted in good faith and held an honest belief in the proffered reasons" for its actions. *Id.* at 626. The plaintiff always bears the ultimate burden of proving that the defendant intentionally discriminated against her because of her disability. *Id.; St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Finally, Dr. DiGiosia also must establish that her perceived disability was the "but for" cause of the decision at issue. *Serwatka v. Rockwell Automation*, 591 F.3d 957, 962 (7th Cir. 2010); *Banaszak v. Ten Sixteen Recovery Network*, 2013 WL 2623882 (E.D.Mich. 6/11/2013), Williams Decl. Ex. G (the ADAAA "regarded as" prong requires a showing that the adverse action would not have occurred "but for" the impairment).

## 1. Dr. DiGiosia's Leave Of Absence Claim Fails

### a. Dr. DiGiosia Cannot Establish That Aurora Regarded Her As Disabled When It Placed Her On Leave

Dr. DiGiosia can present no evidence that anyone involved in the decision to place her on a leave of absence perceived her as disabled. Assuming, *arguendo*, that Dr. Kiefer asked Dr. DiGiosia in their September 18 meeting about her alleged bipolar condition, it does not show that Aurora regarded Dr. DiGiosia as disabled. There is no evidence that Dr. Kiefer said or did anything to suggest that he or Aurora believed Dr. DiGiosia's alleged bipolar condition – as opposed to other factors, including the issues in her personal life – was limiting Dr. DiGiosia in

any way.  Simply knowing that a person is being treated for a medical condition is not evidence that the employer perceived that condition as disabling.  *Amadio v. Ford Motor Co.*, 238 F.3d 919 (7th Cir. 2001); *Kelly v. Drexel, Univ.*, 94 F.3d 102, 109 (3rd Cir. 1996); *Heffernan v. Provident Life & Acc. Ins. Co.*, 45 F.Supp.2d 1147, 1154 (D. Kan. 1999).

There also is nothing improper about assuring that a potential medical condition of which an employer is aware is not the cause of performance issues that may result in discipline.  *See Wright v. Ill. Dept. of Corrections,* 204 F.3d 727, 732 (7th Cir. 2000); *Douglas v. District of Columbia Housing Authority*, --- F.Supp.2d ----, 2013 WL 5764842  (D.D.C. 10/25/2013) (a request for a medical evaluation is not sufficient to establish that an individual was perceived as disabled), Williams Decl. Ex. H; *Keith v. Ashland, Inc.*, 205 F.3d 1340, 2000 WL 178389 (6th Cir. 2000) (offer of paid leave does not mean employee is regarded as disabled), Williams Decl. Ex. I; *Cody v. CIGNA Healthcare*, 139 F.3d 595, 599 (8th Cir. 1998).  In fact, if Dr. Kiefer knew of a medical condition and did not ask about it, his failure to do so may have subjected Aurora to a failure to accommodate claim.  *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 285 (S.D.N.Y. 1999).

Similarly, the fact that Dr. DiGiosia requested medical leave following her conversation with Dr. Kiefer does not establish that Aurora perceived her as disabled.  The evidence is undisputed that Aurora gave Dr. DiGiosia leave options – not that it assumed she needed medical leave.  Nor did Aurora assume that Dr. DiGiosia had a medical condition requiring the leave, simply because Dr. DiGiosia chose to apply for medical leave.  Instead, Aurora required Dr. DiGiosia to submit medical certification before approving her request for FMLA leave.  (SPFOF 41)  Dr. DiGiosia understood that to be the case, and she asked her doctor to provide such documentation.  (*Id*).  In addition, Dr. Kiefer's September 30 letter to Dr. DiGiosia, requesting a

release from her doctor as a condition of returning to work, does not support Dr. DiGiosia's claim that Aurora regarded her as disabled when it placed her on leave. By the time this letter was written, Dr. DiGiosia had already requested medical leave.

### b. Dr. DiGiosia Was Not Meeting Aurora's Legitimate Employment Expectations

Even if Dr. DiGiosia could establish that she was disabled under the ADA, she still cannot establish that she was meeting Aurora's legitimate employment expectations at the time it placed her on leave. It is undisputed that shortly following a C-section performed by Dr. DiGiosia, the baby died, and that within a short period of time thereafter, a baby was stillborn about thirty-six hours after Dr. DiGiosia had treated the baby's mother. (SPFOF 21, 36) Aurora told Dr. DiGiosia that she would need to take some form of leave, giving her three leave options, shortly after the second baby's death, after a peer review had begun, and almost immediately after Dr. Laibly reported to Dr. Kiefer his concerns about Dr. DiGiosia's handling of another patient. (SPFOF 38; APFOF 32, 38) Thus, it is clear that Dr. DiGiosia was not meeting Aurora's legitimate employment expectations at the time Aurora informed her of the need to take a leave.

### c. Dr. DiGiosia Cannot Identify Any Similarly Situated Individuals Who Were Treated More Favorably

Dr. DiGiosia cannot point to any other OB/GYN doctor who had two sentinel events in a ten-week time period and who was not placed on leave. Indeed, Aurora has placed other doctors on leave while a peer review was being performed. (APFOF 46)

### d. Dr. DiGiosia Cannot Establish Pretext

Even if Dr. DiGiosia could establish a *prima facie* case, Aurora has stated a legitimate, non-discriminatory reason—clinical and behavioral issues resulting in a concern for patient

26

safety— for its decision to place Dr. DiGiosia on leave. There is no evidence that at the time Aurora placed Dr. DiGiosia leave, it was motivated by anything other than concerns for patient safety. Dr. DiGiosia cannot deny the events that led up to her leave – two baby deaths. Dr. DiGiosia may disagree about her role in these deaths, but she does admit, as she must, that she treated the mothers whose babies died. There simply is no evidence that Aurora's reason for asking Dr. DiGiosia to take leave was pretext for discrimination based on her alleged disability, or that her alleged disability was the "but for" cause of the required leave.

**2.    Dr. DiGiosia's Discharge Claim Fails As A Matter Of Law**

**a.    Aurora Did Not Regard Dr. DiGiosia As Disabled**

To establish that she was regarded as disabled for purposes of her discharge claim, Dr. DiGiosia must show that the decision makers – the members of the Management Committee – decided to discharge her because of her bipolar condition. Dr. DiGiosia cannot establish this.

The vote to terminate Dr. DiGiosia's employment was unanimous, but only two voting members of the Management Committee even knew of Dr. DiGiosia's alleged bipolar condition, and there is no evidence that those members regarded her as disabled because of it. There is no evidence that the other members of the Management Committee even were aware of Dr. DiGiosia's condition, and it was not discussed in the Management Committee meeting. (SPFOF 57) Further, it is undisputed that the Management Committee did not act until it had received information about Dr. DiGiosia's handling of patients, including in particular the report of Dr. Mason (who also had no knowledge of Dr. DiGiosia's alleged bipolar condition).

27

b.      **Dr. DiGiosia Was Not Meeting Aurora's**
        **Job Expectations**

Even if Dr. DiGiosia could establish that she was disabled under the ADA at the time she

was discharged, she still cannot establish that she was meeting Aurora's legitimate job

expectations.  It is undisputed that two sentinel events had occurred, and that upon returning Dr.

DiGiosia to work from her leave of absence, Aurora limited her practice to office gynecology

because of concerns for patient safety.  (SPFOF 21, 36, 47)

While Dr. DiGiosia believes that nothing she did or failed to do contributed to the deaths

of the two babies, Aurora had the right to rely upon the independent peer review performed by

Dr. Mason.  Dr. Mason reviewed not only the records provided by Aurora, but also spoke with

Dr. DiGiosia at length.  (SPFOF 51)  Dr. Mason found several areas of concern regarding Dr.

DiGiosia's handling of patients, including her failure to correctly read NSTs – a basic aspect of

her job.  (APFOF 69, 71)  Thus, it is undisputed that Dr. DiGiosia was not meeting legitimate job

expectations.

c.      **Dr**. **DiGiosia Cannot Identify Any**
        **Similarly Situated Individuals Who Were**
        **Treated More Favorably**

Dr. DiGiosia cannot point to any physician at the Oshkosh Clinic who had two sentinel

events in a ten-week time period, and who was not ultimately discharged after an independent

reviewer determined that issues existed regarding the physician's handling of numerous cases.

In fact, Dr. DiGiosia admits she is not aware of any other doctors who had two babies die within

a ten week period.  (APFOF 83)

Even if Dr. DiGiosia could establish a *prima facie* case, Aurora has stated legitimate, non-discriminatory reasons—clinical and behavioral issues resulting in a concern for patient safety and a loss of confidence in her abilities—for its decision to discharge Dr. DiGiosia.

Of the voting members of the Management Committee that made the discharge decision, only Drs. Landauer and Kiefer knew about Dr. DiGiosia's bipolar condition, and there is no evidence that either of them mentioned this condition to the other members of the Management Committee.  Further, the Management Committee did not act until it had heard Dr. Duffy's summary of issues and the Peer Review Committee's report.  (APFOF 80, 81)

While Dr. DiGiosia may disagree with Aurora's assessment of her performance, she has presented no evidence that Aurora was motivated by prohibited animus in reaching its termination decision, and she has presented no evidence that the individuals who believed these serious performance issues existed, did not honestly believe they existed or that they were serious.

There is not a scintilla of evidence that anyone held a bias against Dr. DiGiosia because of a bipolar condition.  To the contrary, Aurora initiated the peer review that ultimately led to Dr. DiGiosia's discharge only after multiple concerns were raised about her handling of patients after two babies died.  Further, the person who first called for the peer review – Dr. Laibly –did not know about Dr. DiGiosia's medical condition until Dr. Devermann told him of it in the course of the peer review process.  (APFOF 33)

In sum, there simply is no evidence that Aurora's decision to terminate Dr. DiGiosia's employment was motivated by her alleged disability, rather than her performance issues, which

were substantiated by an independent reviewer. Dr. DiGiosia's alleged disability must be the "but for" reason for the discharge—an element that Dr. DiGiosia cannot establish.

## III. AURORA IS ENITTLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR REPAYMENT OF $19,649, WITH INTEREST AND ATTORNEYS' FEES

Aurora's counterclaim alleges that Dr. DiGiosia breached the Physician Employment Agreement, or alternatively was unjustly enriched, because a final accounting of her actual production as compared to the draws she had been paid showed that she had been overpaid in the amount of $19,649. Aurora has pleaded its entitlement to this amount, together with interest and attorneys' fees, as provided for in the Physician Employment Agreement. Dr. DiGiosia did not file an Answer to Aurora's Counterclaim, and all of the allegations in the Counterclaim are deemed admitted. Fed.R.Civ.P. 8(b)(6)  Thus, it is undisputed that Dr. DiGiosia breached her Physician Employment Agreement by accepting the overpayment of draws and not repaying it, that she has been unjustly enriched by retaining this money, and that Aurora is entitled to repayment of the amount claimed, together with interest and its attorneys' fees.

Further, Dr. DiGiosia has admitted that the only reason she has not repaid the amount at issue is because she believes the overpayment resulted from her not working while on leave, at Aurora's request. (APFOF 86)  Aurora's decision to place Dr. DiGiosia on a leave was not discriminatory, and it is not a defense to Aurora's breach of contract claim against Dr. DiGiosia. As such, Aurora is entitled to summary judgment in its favor on its counterclaim.

## CONCLUSION

There is no genuine dispute as to any material fact and Aurora is entitled to judgment as a matter of law on both Dr. DiGiosia's claims and on its counterclaim..

QB\22181288.10

Dated:  January 3, 2014.

s/ Judith A. Williams-Killackey
JUDITH A. WILLIAMS-KILLACKEY SBN: 1029928
MARY PAT JACOBY SBN: 1016956
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Ste. 2350
Milwaukee WI  53202-4497
414.277.5439
judi.williams@quarles.com
mary.pat.jacoby@quarles.com

*Attorneys for Defendant*