UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JULIANA DIGIOSIA,

    Plaintiff,

v.                                                                                  Case No. 12-C-1292

AURORA HEALTH CARE, INC.,

    Defendant.

---

**DECISION AND ORDER**

---

Plaintiff Dr. Juliana DiGiosia brought this action against her former employer, Aurora Health Care, alleging that she was placed on leave and ultimately terminated in violation of the Americans With Disabilities Act (ADA) and the Americans With Disabilities Act Amendments Act (ADAAA) of 2008. The Defendant has moved for summary judgment. For the reasons given below, the motion will be granted.

**I. Background**

Between 2002 and January 8, 2009, Dr. DiGiosia worked as an obstetrician-gynecologist at Aurora's Oshkosh medical clinic. During her tenure, she was not disciplined or cited for any misconduct either by her employer or by the Wisconsin Medical Board. She also received good performance reviews during her employment. During her tenure, some employees and colleagues viewed her with admiration while others became disenchanted with her behavior and personality. Eventually, two significant "sentinel" events—the deaths of two babies—gave rise to an internal peer review and a process that ultimately led to Plaintiff's termination.

According to Aurora, things took a turn for the worse in 2007, after Plaintiff's husband was charged with manslaughter in connection with a car accident. In 2008, Plaintiff was performing a C-section on a patient but had difficulties and was unable to finish it after her arms became tired. A colleague, Dr. Pech, came in to assist and was able to deliver the baby in under a minute. Unfortunately the infant died. Plaintiff believes it was due to disseminated intravascular coagulation, while some of Aurora's other physicians believe it could have been metabolic acidosis and asphyxia, a direct result of the birthing process, which led to the coagulation. (ECF No. 34 at 28.) The next month a committee was convened to review the procedures during and subsequent to the birth, and during these proceedings the chair of the OB/GYN department, Dr. Laibly, became concerned about Plaintiff's competence. He noted the fact that Dr. Pech was able to deliver the child in less than a minute after coming to assist, and further noted that the C-section took an unusually long time. (ECF No. 34 at ¶¶ 7-9.) A second review panel concluded that everything was done properly, however. The Defendant expresses little confidence in the second review because all the records were not available and because the blood monitor used was a model unfamiliar to the nurse who used it.

In any event, things continued to go downhill that summer, with colleagues complaining that Dr. DiGiosia was dumping complicated patients on them, leaving work early, and generally not carrying her weight. In August, Plaintiff ordered a nonstress test to assess a fetus' health because the mother reported a decrease in movement. The test showed non-reactivity, so Plaintiff sent the patient to the hospital for a second test, which Plaintiff read as reactive, meaning that the fetus was moving. In fact, the baby was stillborn two days later. Dr. Laibly believed Plaintiff had misread the second test, which in his view confirmed the first one, i.e., that there was no fetal movement. He

2

also believed Plaintiff was attempting to reduce her treatment of higher-risk patients such as diabetics, and this caused him to lose faith in her practice. (ECF No. 34 at 20-21.) With two infant deaths in one summer—something that was highly unusual—Dr. Laibly began consulting with Plaintiff's other colleagues and initiated a peer review of Plaintiff's treatment. After communicating with Aurora's regional vice-president, Dr. Devermann, Dr. Laibly talked to Dr. Duffy, another colleague, who began the process of having an outside reviewer investigating Plaintiff's conduct. Dr. Laibly also voiced his concerns to the president of the clinic's management committee, Dr. Kiefer, who investigated matters further and eventually got Aurora human resources involved. On September 19, 2008, Dr. Kiefer met with Plaintiff and informed her that she would be placed on leave—either voluntary or involuntary. Plaintiff requested medical leave. While she was on leave, the other OB/GYN physicians voted 4-1 that she not return to practice with them.

The report from an outside reviewer, Dr. Mason of the Aurora UW Medical Group in Milwaukee, was dated November 19, 2008 and noted several concerns, both with the care provided by Plaintiff as well as some of the record-keeping and interaction between other physicians. (ECF No. 36-2 at 39-40.) As Plaintiff notes, however, the report was not a damning indictment of Dr. DiGiosia but simply expressed some concerns and asked for more information. A follow-up report noted that Plaintiff had indeed possibly misread more than one nonstress test result, and indicated concern about Plaintiff's treatment of hypertensive patients.[1] (*Id.* at 41.) The clinic's peer review committee accepted Dr. Mason's report and allowed Plaintiff the opportunity to defend her

---

[1] Plaintiff argues that reading the test results involves gray areas and that reasonable physicians can sometimes disagree about the results. Resolution of the matter is impossible at this stage, although the fact that the baby was stillborn after the mother reported decreased activity is suggestive. For present purposes it will suffice to note that more than one physician raised questions about Dr. DiGiosia's conclusions.

3

treatment, but ultimately the committee viewed Plaintiff as having significant problems with documentation, interpreting test results and non-standard care of patients. It then referred the matter to the management committee, which had the ultimate say in her employment. According to an email from Dr. Devermann, the peer review committee would be recommending significant corrective actions, including mentoring and additional education, while her colleagues in the OB/GYN department would be recommending termination based on "lost faith and trust in the quality and reliability of her work." (ECF No. 36-2 at 52.) At a January 2009 management committee meeting, the committee unanimously decided to terminate Plaintiff's employment.

## II. Analysis

This case involves an element of complexity because the ADAAA became effective on January 1, 2009, just days before the Plaintiff was terminated. Plaintiff's claims are two-fold. First, she argues that she suffered an adverse employment action when she was placed on leave in 2008. At that time, the employer's conduct was governed by the ADA. The second claim involves the termination itself, in January 2009, which is governed by the ADAAA. The differing standards will be discussed below, as relevant.

### A. Leave

On September 19, 2008, Plaintiff met with Dr. Kiefer, the head of the clinic management committee, who informed her that she would need to go on leave—either voluntary, medical, or involuntary. Plaintiff opted to take medical leave and submitted the appropriate paperwork to that effect. Plaintiff argues that the forced leave violated the ADA because it was caused by the fact that her employer "regarded" her as disabled.

In order to show she was "regarded as" having a disability under the ADA, an employee must

4

demonstrate either that (1) the employer mistakenly believes that she has a physical impairment that substantially limits one or more major life activities, or (2) mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). The ADA thus does not protect anyone who has or is perceived to have *any* illness; it only protects those who are (or are perceived to be) *substantially* limited in a *major* life activity. *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 198 (2002) (holding "[i]t is insufficient for individuals ... to merely submit evidence of a medical diagnosis of an impairment.... [T]he ADA requires ... evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.") Here, Plaintiff alleges the employer believed she was substantially limited in her ability to think and work. There is no evidence that anyone believed Plaintiff could not think, and Plaintiff's argument on that point is cursory and can be dispensed with summarily. There is, however, evidence that one or more of her colleagues believed her job was affected; that, after all, is why they terminated her. When the ability to work is at issue, there must be evidence that the employer believed Plaintiff was "limited in her ability to perform not merely one particular job but a class or broad range of jobs." *Hanson v. Caterpillar, Inc.,* 688 F.3d 816, 2012 WL 3139946 (7th Cir. 2012) (quotation omitted).

At the outset, I note that a "regarded as" claim is facing an uphill battle under these circumstances. As Plaintiff herself points out, the "regarded as" clause was designed to protect people who are not actually disabled but who might suffer from stereotypes and prejudices harbored by ignorant employers. *Harrington v. Rice Lake Weighing Sys., Inc.,* 122 F.3d 456, 459 (7th Cir. 1997) ("The 'regarded as' portion of the ADA was designed to combat erroneous stereotypes that employers may have about impairments that are not, in themselves, substantially limiting.") But here

5

the decisionmaker is not just one possibly ignorant employer, it is a group of practicing physicians—individuals schooled in medicine who presumably have at least a basic understanding of bipolar disorder, a very common mental illness. Under such circumstances Plaintiff would have difficulty showing that the employment decisions were based on a misunderstanding about the nature of her illness, particularly given the large number of physicians involved—her colleagues in OB/GYN as well as the ten members of the management committee (of which there is some overlap). In addition, the claim is almost self-contradictory. Plaintiff alleges that many of her colleagues knew she had bipolar disorder for several years—even dating back to a hospitalization from 2001—and yet they hired her and then worked with her peacefully for six years. Then, out of the blue, not just one but several doctors suddenly developed a prejudice against her because of her bipolar disorder. In sum, the claim is inherently implausible because (1) the decisionmakers are physicians, (2) there are so many different physicians involved, and (3) the relationship lasted long after her colleagues are alleged to have learned about her condition.

Turning to the particular facts of this case, it is clear that Plaintiff's claim cannot get past the summary judgment stage because there is no evidence that any of the decisionmakers considered Plaintiff's bipolar disorder a "disability" in the ADA sense of the term. As noted above, to be disabled (or *regarded as* disabled), the effect must involve a substantial impairment on major life activities, for example, an inability to perform a broad range of jobs. At worst, the evidence here shows that the decisionmakers might have believed that Plaintiff could no longer perform as an OB/GYN and a surgeon—a very specific and narrow class of jobs. There is no indication that anyone believed Plaintiff could not perform a wide array of jobs, including that of primary care physician. Instead, their complaints involved her work ethic, her ability to read standard obstetric

6

tests, and perform C-sections. In short, no one viewed Plaintiff as disabled. *Fleishman v. Continental Cas. Co.,* 698 F.3d 598, 608 (7th Cir. 2012) ("Fleishman is correct that the evidence suggests Izzo and others knew Fleishman had medical problems related to his aneurism. But nothing suggests that anyone at Continental thought this condition substantially affected his ability to earn a living.")

Plaintiff cites her long and somewhat well-known history of bipolar disorder, and she relies heavily on what she views as flippant comments allegedly made by Dr. Pech about her manic phases. But the fact that people are aware of a disorder—and even make fun of it to some degree—does not mean they view her as having a disability in the ADA sense of the term. Suppose an individual is obese, which can be a disability if it substantially impacts major life activities. The fact that a co-worker might make the occasional fat joke says nothing about the co-worker's views of the employee's ability to perform *major* life activities. It is simply a bad joke, made in poor taste. By contrast, if the employer had made a remark questioning the employee's ability to function in major life activities, it could be relevant. But that is not what happened here. Taking the facts in the light most favorable to the Plaintiff, all that happened is that one of her colleagues made a couple of questionable remarks making reference to her "manic" condition. In fact, the context of the allegedly disparaging remarks in this case demonstrates that they do not evidence a belief that anyone regarded Plaintiff as substantially limited in any major life activity. For example, Dr. Pech is alleged to have said "Juliana's gone manic again," and "Juliana's too manic to even know how many patients she has." Even assuming the remarks were meant in a derogatory fashion, Dr. Pech's comments do not reflect the view that bipolar individuals in general, or Juliana DiGiosia in particular, are substantially limited in major life activities, including thinking or working. Instead,

7

at most they simply reflect Pech's view that Plaintiff's manic phase possibly impacted her ability to do *that* job, possibly because she did not know how many patients she had. (And this is a stretch.)

This case is like *Povey v. City of Jeffersonville, Ind.,* where an employee of an animal shelter injured her wrist. 697 F.3d 619, 623-24 (7th Cir. 2012). The resulting work restrictions required other employees to work weekends, which gave rise to discord in the ranks. Eventually the employee was terminated. In her subsequent "regarded as" claim, she cited the comments made by co-workers that she "wasn't able to use her right hand" and that there were no jobs for her at the shelter. *Id.* at 23. The court found, however, that these were not sweeping statements about disability in general but merely evidence that the plaintiff couldn't work at that specific job.

> Here, none of the statements made by Calabro and Wilder are so "sweeping" as to exclude Povey from a broad class of jobs. Calabro's and Wilder's statements were made in response to questions regarding Povey's abilities to complete tasks specific to the Jeffersonville animal shelter. For example, Calder's testimony that Wilder told her that Povey "couldn't do a whole lot of anything" was directly in response to a question regarding what he specifically said she could not do related to duties in the animal shelter facility. Wilder's statement that Jeffersonville, "did not have a job for that" was also in response to a specific question regarding whether Povey could continue to perform her job at the animal shelter given her permanent restrictions. It is clear that, when taken in context, the statements only refer to Povey's abilities to work within the animal shelter. <u>The fact that Jeffersonville viewed Povey as unable to perform the tasks required at the Jeffersonville animal shelter tells us nothing about Jeffersonville's perception of her abilities to perform a broad range of jobs.</u>

697 F.3d at 623-24 (7th Cir. 2012) (emphasis added).

In our case, all we have is a general reference to Plaintiff being "manic" on one occasion and another statement suggesting that she didn't know how many patients she had. These are not "sweeping" comments about Plaintiff's ability to work in general, but (at worst) suggestions that

8

Plaintiff was unfit to be an OB/GYN. Just as in *Povey,* they are not evidence that the Plaintiff could not perform a broad range of jobs.

This conclusion is underscored by more evidence that the Plaintiff herself cites. Specifically, she notes that Dr. Pech, in an earlier review of her work (when he was department chairman), noted that she had bipolar disorder. But in the same performance review, as with previous reviews, Pech rated her work and behaviors as good in all categories. (ECF No. 33, ¶¶ 8, 9.)[2] Thus, the evidence only shows that although Dr. Pech clearly knew Plaintiff was bipolar, he viewed her as "good" at her job. To the extent he commented about it, possibly in a derogatory fashion, that evidence is only barely suggestive that he viewed her condition as impacting her work as an OB/GYN. It is not even remotely suggestive that he viewed her mental illness as impacting her ability to perform major life activities.

Plaintiff also cites the fact that Dr. Kiefer, the clinic head, discussed her bipolar disorder with her during the meeting in which he told her she needed to take leave. But once again mere knowledge of someone's mental illness does not mean that the individual harbors a belief that the employee is substantially restricted in performing any major life activities. In short, neither Dr. Pech nor anyone else regarded Plaintiff as disabled when she was told to take leave. *See also Squibb v. Memorial Ctr.,* 497 F.3d 775, 782 (7th Cir. 2007) ("A demonstrated 'inability to perform a single, particular job' does not render an individual substantially limited in the major life activity of working.") Because there is no evidence that any of the Defendant's decisionmakers regarded

---

[2]These reviews do not appear to be in the record, but the point is stipulated.

Plaintiff as being disabled, her claim based on the 2008 leave will be dismissed.³

**B. Termination**

To prevail on an ADAAA discrimination claim, the plaintiff bears the burden of showing that (1) she is disabled within the meaning of the ADAAA; (2) she is qualified to perform the essential functions of the job either with or without a reasonable accommodation; and (3) she suffered an adverse employment action on the basis of her disability. *Majors v. General Electric,* 714 F.3d 527 (7th Cir.2013). Under the indirect method, which Plaintiff follows here, a plaintiff must first establish a *prima facie* case of discrimination and show that: (1) she is disabled under the ADAAA; (2) she is qualified to perform the essential functions of the job; and (3) she suffered an adverse employment action. *Hoppe v. Lewis Univ.,* 692 F.3d 833, 838–39 (7th Cir. 2012). After the plaintiff establishes a *prima facie* case, the burden shifts back to the employer to provide a nondiscriminatory reason for the employment action. If the employer does so, the burden shifts back to the plaintiff to establish that the employer's articulated reason is a pretext for intentional discrimination. *Nawrot v. CPC Int'l,* 277 F.3d 896, 905 (7th Cir.2002).

The first step requires the Plaintiff to show that she is disabled. (As will be discussed below, the first step under the ADAAA is actually quite comprehensive.) Under the ADAAA, a person may be considered disabled if she is "regarded as" disabled "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life

---

³Plaintiff very briefly argues that she had a "record of" a disability, but that claim is not sufficiently presented to avoid waiver. In any event, the claim would fail because "[t]o succeed under her "record of disability" claim, [Plaintiff] must again show that she had a 'physical impairment that substantially limits one or more major life activities.'" 29 C.F.R. § 1630.2(k). *Serednyj v. Beverly Healthcare, LLC,* 656 F.3d 540, 556 (7th Cir. 2011).

activity." 42 U.S.C. § 12102(3). As should be readily apparent, the ADAAA expanded the scope of the ADA's "regarded as" clause to cover perceived impairments even if no one thought those impairments were substantial. For example, an employer who fired someone because he had ten percent hearing loss would violate the ADAAA, whereas such an act would not violate the ADA because no one would ever argue that the minor hearing loss impacted a major life activity. *Jennings v. Dow Corning Corp.,* 2013 WL 1962333, at *9 (E.D. Mich. May 10, 2013) ("The puzzling result is that plaintiffs are now entitled to protection under the ADA without evidence that they are 'disabled,' or that an employer regarded them as such. It is enough that an employer took some adverse employment action because of some impairment, whether real or imagined, no matter how insubstantial.")

Here, Plaintiff notes that several of her co-workers knew she suffered from bipolar disorder, and thus a jury could readily conclude that she had an "actual or perceived . . . mental impairment." *Id.* The fact that some of the decisionmakers might have known about her condition does not end matters, however. It is true that in common parlance to "regard" something is simply to observe or comprehend it; it is a passive undertaking. Under the ADAAA, however, it has a special, more active, meaning. It is not enough that an employer "regard" someone as impaired in a passive sense, meaning simply that the employer knows about the impairment. Instead, the employer must take action based on that perception:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter <u>because of</u> an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

11

42 U.S.C. § 12102(3)(A) (emphasis added).[4]

Thus, by incorporating the "because of" clause into the definitional section, the ADAAA (somewhat strangely) builds causation into the very definition of disability itself. *Pinckney v. Federal Reserve Bank of Dallas,* 2013 WL 5461873, *11 (W.D. Tex. 2013) (noting that "the third prima facie element of disability discrimination appears to be subsumed into the definition of "regarded as" disabled.) To qualify as disabled under the regarded-as clause, the employee must show not only that the employer knew about her impairment, but that she was subjected to prohibited discrimination *because of* the impairment.[5]

As set forth above, Plaintiff's evidence is directed primarily at showing that her colleagues knew she had bipolar disorder and that one of them made a couple of stray remarks about it. The

---

[4]Interestingly, the amendment is nonsensical. The statute continues to define disability as a substantial limitation on a major life activity, and then states that one may be deemed disabled if she is regarded as having "such an impairment" (i.e., a substantial limitation of a major life activity.) But then in section (3)(A) it states that one could be considered to have "such an impairment" whether or not the impairment limits or is perceived to limit a major life activity. In other words, one may be regarded as having a substantial limitation on a major life activity even if one is *not* regarded as having a substantial limitation on a major life activity. As one commentator quipped, "[t]he amended provision is therefore analogous to 'wanting a dog that fetches sticks, except that the dog does not have to fetch sticks.'" Jill C. Anderson, Misreading Like A Lawyer: Cognitive Bias In Statutory Interpretation, 127 Harv. L. Rev. 1521, 1567 n.195 (April 2014).

[5]Some courts have side-stepped this threshold definitional issue. For example, in *Mengel v. Reading Eagle Co.,* the court concluded that it is enough to show that a supervisor knew an employee had an impairment. 2013 WL 1285477, *4 (E.D. Pa., March 29, 2013). But as noted herein, the statute itself builds causation right into the definition of regarded-as disability, and so it would appear more proper (if conceptually awkward) to consider the causation question during the initial analysis of whether the plaintiff is regarded as having a disability.
    The point could be purely academic, of course, because a plaintiff must always demonstrate causation.

12

evidence that Dr. Pech allegedly made remarks about Plaintiff being "manic" does not show the requisite causation. First, Dr. Pech was not on the management committee, which had the final say and which voted unanimously for termination. *Lucas v. Chicago Transit Auth.,* 367 F.3d 714, 730 (7th Cir. 2004) ("Generally speaking, comments by a non-decision maker do not suffice as evidence of discriminatory intent.") Second, Pech worked with Plaintiff for years and even took her to the hospital in 2004 for mental health treatment. Based on the length of the relationship and his knowledge about her condition, a jury could not reasonably infer that in 2008 Pech suddenly developed an animus against Plaintiff *because of* that condition. Obviously some bad blood developed along the way (infecting much of the department, apparently), but there is no evidence that relationships withered due to some kind of discriminatory animus.

Plaintiff also relies heavily on her proposed finding of fact that in a September 2008 meeting with Dr. Kiefer—the meeting at which Kiefer told her she must take leave—he asked how she was doing with her bipolar disorder, what medication she was taking, and he discussed his own family's history with the condition. (ECF No. 42 at ¶ 53.) Dr. Kiefer disputes this, suggesting that he was only responding to what she herself volunteered about her condition and treatment. (After all, it was the Plaintiff who informed him she would be taking *medical* leave.) In addition, Plaintiff also notes that during the investigation Kiefer went out of his way to tell her she was regarded as a very good surgeon, which undercuts the suggestion that he harbored some kind of discriminatory ill will towards her.

What Dr. Kiefer said is not resolvable in summary judgment, but even if Kiefer and some members of her department knew Plaintiff was bipolar, and even if they wanted to get her fired for that reason, they were not the ones who made the decision to terminate her. In 2008-09, the

13

management committee consisted of ten voting members and four non-voting members. We may assume that Dr. Kiefer (the president of the committee), and Dr. Landauer, Plaintiff's sister-in-law, knew about her bipolar condition. But they were only two votes on a committee of ten. Plaintiff vaguely alleges that "everyone" at "Aurora" knew about her condition, but her evidence for this is that one doctor believed that Drs. Anderson, Pech, Holly, Landauer, the nurse midwives, and "possibly" Dr. Laibly knew. (ECF No. 42 at ¶ 19.)[6] Among these individuals, only Dr. Landauer had a vote on the management committee. Although this is flimsy evidence, the Defendant notes that it is not even evidence at all because the deposition supporting that proposed finding is not in the record.

The point is that, at most, the Plaintiff only has evidence that two voting members of the management committee even knew she had bipolar disorder. The is no evidence that the other eight members of the committee, who came from other departments like surgery, internal medicine, pediatrics, and family practice, had knowledge of her condition. In the rare case, the discriminatory animus of a non-decisionmaker (like Dr. Pech) or a decisionmaker (like Dr. Kiefer) can be imputed to an employer even when the decision is made by an otherwise independent person or committee. This is known as the "cat's paw" theory, the idea being that in some cases a single individual can manipulate others to achieve his own discriminatory ends. *See Hicks v. Forest Preserve Dist. of Cook Cnty.,* 677 F.3d 781, 790 (7th Cir. 2012) ("'[I]f a supervisor performs an act motivated by [a discriminatory or retaliatory] animus that is intended by the supervisor to cause an adverse

---

[6]She also notes that some of her colleagues worked at a different hospital when she was admitted there for treatment in 2001. She does not explain how or why OB/GYN physicians would be expected to know the identities of patients admitted to a hospital for psychiatric care, however. Hospitals admit thousands of patients per year, and doctors do not know all of those patients' identities unless they are involved in their treatment.

14

employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable.'") (citation omitted).

Plaintiff does not even argue this theory. Even if she did, however, the cat's paw theory would not apply here because Dr. Pech was not her supervisor, and Dr. Kiefer was simply one vote on the committee. (It is unclear if he was a supervisor; he *sounds* like a supervisor, as clinic president, but medical practices and partnerships are not necessarily hierarchical.) Dr. Kiefer, as the clinic president and head of the committee, may have been responsible for getting the formal investigation going, but this was in response to concerns that were raised by Drs. Pech and Laibly, following what were obviously extremely serious adverse events. Thus, it is not surprising that the head of the clinic would initiate the investigation and HR machinery, regardless of whether he harbored some kind of ill will against bipolar individuals. In any event, there is no suggestion that he told members of the committee about Plaintiff's mental health condition, nor is it claimed (because it would be outlandish) that he would have been able to "dupe" the entire committee or engineer a unanimous vote of ten physicians, particularly when the committee heard evidence from the outside reviewer, Dr. Mason, who had no idea Plaintiff was bipolar either. *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir.2013) (cat's paw liability arises when "a biased subordinate who lacks decision-making power uses the formal decision maker 'as a dupe in a deliberate scheme to trigger a discriminatory employment action.'") (quoting *Smith v. Bray,* 681 F.3d 888, 897 n.3 (7th Cir. 2012)). Added to this is the fact that Dr. Duffy, a primary care physician, was the leader of the peer review committee and the one who coordinated much of the investigation and presented the findings to the management committee. Plaintiff concedes that Dr. Duffy was not aware of her bipolar disorder. (ECF No. 41 at ¶ 34.)

In short, there is no evidence that a majority of the management committee even knew that

15

Plaintiff had bipolar disorder. Thus, there is no evidence that her condition was *a* cause of the decision to terminate her employment, much less that it was *the* (but-for) cause of the termination. *Serwatka v. Rockwell Automation, Inc.,* 591 F.3d 957, 962 (7th Cir. 2010) (vacating an ADA jury verdict based on a mixed-motive finding, holding that "because of" means but-for). Because Plaintiff was not terminated "because of" any real or perceived mental impairments, I conclude Plaintiff was not "disabled" within the meaning of the ADAAA.

**C. Pretext**

Even if she could show that she was disabled within the meaning of the ADA or ADAAA and establish a prima facie case of discrimination, Dr. DiGiosia could still not prevail because she cannot show that the legitimate, non-discriminatory reasons Aurora gave for its decision to place her on leave and then terminate her employment–clinical and behavioral issues resulting in a concern for patient safety–were pretextual. A plaintiff may demonstrate pretext by showing that the defendant's proffered reasons for taking adverse employment actions "(1) had no basis in fact; (2) did not actually motivate [the adverse employment actions], or (3) [were] insufficient to motivate [the adverse employment actions]" and were therefore pretextual. *Davis v. Wis. Dept. of Corrections*, 445 F.3d 971, 977 (7th Cir. 2006). It is not enough that the plaintiff disagrees with the proffered reason. As the Seventh Circuit has repeatedly stated in ADA cases and in other contexts, a court does not "sit as a super-personnel department; our only concern with respect to pretext is the honesty of an employer's explanation." *Dyrek v. Garvey,* 334 F.3d 590, 598 (7th Cir. 2003). "This Court has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions." *Green v. National Steel*

*Corp., Midwest Div.,* 197 F.3d 894, 899 (7th Cir. 1999).

The issue on summary judgment is whether the defendant's version of the event is credible, not whether it is the only version. *Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 778 (7th Cir. 2013). In other words, "[p]retext is more than a mistake on the part of the employer; it is a phony excuse." *Id.*; *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). Thus, "[t]o demonstrate a material issue of fact as to pretext, a plaintiff must show that 'either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible.' " *Mullin*, 732 F.3d at 778 (citation omitted). Dr. DiGiosia does not come close to making either showing here.

There is no dispute that serious questions were raised concerning Dr. DiGiosia's actions in two sentinel events, each involving the death of a baby, in less then three months. Additional complaints with her handling of cases were noted as well. While Dr. DiGiosia may disagree with the concerns raised by her colleagues, there was clearly a factual basis for them, as the outside review ultimately established. Neither Dr. Duffy nor Dr. Mason knew about her disability, and yet each one harbored very serious concerns about her medical care. As noted above, the panel of physicians heard the evidence and rejected the idea of additional education and mentorship and instead voted unanimously for termination. It is difficult to think of a more important consideration than patient safety for a health care provider such as Aurora. At best, Plaintiff has demonstrated that there is a disagreement about the quality of the care she provided. She has not even come close to showing that the employer's reasons, backed up by the considered determinations of more than a dozen physicians, was false or not honestly believed, and for that additional reason, her claims fail.

**D. Overpayment Counterclaim**

Aurora brought a counterclaim alleging that Plaintiff breached her employment agreement

by not returning some $19,649 she had been overpaid. The employment agreement also provides for attorney's fees. Plaintiff did not file an answer to the counterclaim, and thus the claim is undisputed. Plaintiff's only argument to the contrary is that she believes being placed on leave was a discriminatory act, but as noted above there is no evidence of that. In short, Plaintiff has not provided any defense to the counterclaim.

**III. Conclusion**

It is clear that Plaintiff believes the medical treatment she provided was above reproach and therefore it cannot be the whole story behind her termination. She might be right. From the record it seems likely that in addition to their stated concerns about her treatment of patients, her colleagues were also becoming frustrated with her personally and no longer valued her as a colleague. But the fact that treatment concerns might not be the whole story does not mean that she can survive summary judgment. This is a lawsuit under the ADA and ADAAA, and Plaintiff has been unable to show that Aurora was motivated by a desire to discriminate against her due to a real or perceived disability. Accordingly, the Defendant's motion for summary judgment is **GRANTED**. Plaintiff's complaint is **DISMISSED**. Defendant is entitled to entry of judgment on its counterclaim in the amount of $19,649 plus interest and reasonable attorney's fees.

**SO ORDERED** this 24th day of September, 2014.

    /s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court